IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | | |
|---|---|---|
| ALEXANDER RHODES | ) | Civil Action No. 2:22-CV-00101 |
| | ) | |
| *Plaintiff,* | ) | Honorable Judge W. Scott Hardy |
| | ) | |
| v. | ) | COMPLAINT FOR: |
| | ) | |
| ALTHEA AZEFF | ) | Libel Per Se |
| | ) | Libel Per Quod |
| *Defendant.* | ) | Slander Per Se |
| | ) | Slander Per Quod |
| | ) | Invasion of Privacy |
| | ) | Intentional Infliction of Emotional Distress |
| | ) | Publicity Given to Private Life |
| | ) | Intrusion Upon Seclusion |
| | ) | |

**FIRST AMENDED COMPLAINT - CIVIL ACTION**

Plaintiff Alexander Rhodes, by and through undersigned counsel, hereby states as follows in support of his First Amended Complaint against Defendant Althea Azeff.

**Parties**

1.      Plaintiff Alexander Rhodes (hereinafter "Plaintiff") is a private individual residing in the Western District of Pennsylvania at all times material herein.

2.      Defendant Althea Azeff (hereinafter "Defendant Azeff") is an individual believed to reside within Thurston County, Washington, although her current whereabouts are unknown.

**Venue and Jurisdiction**

3.      This Court possesses federal diversity under 28 U.S.C. § 1332 as the parties are diverse in citizenship and the amount in controversy exceeds the jurisdictional minimum of $75,000.

4.     Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because Defendant Azeff purposely directed her tortious activities against Plaintiff in the State of Pennsylvania and caused harm to him in this venue. Further, Defendant Azeff interfered in litigation that took place in the Western District of Pennsylvania. Defendant Azeff has long held significant and systematic ties to the Pittsburgh area, including previously owning property, maintaining employment, and conducting business in the Pittsburgh area. Many of the matters to be litigated occurred or purportedly occurred in the Pittsburgh area.

## Factual Allegations

### Overview and Background

5.     This matter arises out of a vast quantity of false and defamatory statements (hereinafter, the "False Statements") published by Defendant Azeff. These False Statements falsely purport, among many other things, that Plaintiff has engaged in a wide variety of illegal, violent, criminal, fraudulent, unsavory, threatening, discriminatory, abusive, unethical, and immoral behaviors. The False Statements include, but are not limited to, false allegations of Plaintiff attempting to murder Defendant Azeff, attempting to murder numerous other people, being a fraudster, being mentally unstable and dangerous, holding extremist views, making threats, and being an accomplice to a mass shooting. Further, Defendant Azeff's False Statements purport that Plaintiff lied when he privately shared with his partner that he was sexually abused as a child. Defendant Azeff carefully fabricated and intentionally targeted her False Statements to inflict the greatest possible damage to Plaintiff.

6.     Defendant Azeff is the biological mother of Plaintiff. The Parties have an estranged relationship after Plaintiff cut off communication with her in 2019.

7.      Around the age of eleven, Plaintiff encountered porn while using the Internet. This quickly escalated into an out-of-control porn habit that took over his life. Eventually, Plaintiff created a peer support network for people to discuss the effects of excessive porn use, compulsive sexual behavior, and the recovery process (hereinafter, the "Recovery Support Network"). Plaintiff incorporated a limited liability company for the purpose of operating the Recovery Support Network and to provide peer support and resources to those who have an addiction to porn or who feel that they struggle with excessive porn use.

8.      While not a mental healthcare professional, Plaintiff offers the perspective of a nonreligious person (who does not have moral qualms with masturbation or using pornography) who used far too much porn growing up. Plaintiff advocates for recovery, not against the existence of pornography itself. Plaintiff has consistently stated that he is against censorship of the creation or consumption of consensual pornography. Until experiencing extensive harassment, Plaintiff had been willing to transparently talk about the adverse effects of porn addiction that he experienced in his life.

9.      Plaintiff has had an excellent reputation within his field, although it has been negatively impacted due to defamation and disinformation. The Recovery Support Network has been utilized by many individuals who struggle with issues stemming from excessive pornography use.

10.     While Plaintiff maintains a private life, the Recovery Support Network's work has been featured by numerous media outlets and publications, including Time Magazine, CNN, CBS, the New York Times, MTV, Showtime, the Washington Post, Business Insider, Cosmopolitan, Men's Health, New York Magazine, San Francisco Magazine, Esquire, BBC, NPR, and the Pittsburgh Post-Gazette.

**Previous Tortious Conduct Targeting Plaintiff**

11.     Over the years, a vigorous debate has emerged about whether excessive, out-of-control pornography use could be considered a behavioral addiction or if excessive pornography use can be a direct cause of issues (rather than just a symptom of sexual shame or other mental health issues). As such, Plaintiff and the Recovery Support Network have become a target for criticism by some porn advocates who disagree that porn addiction is a valid mental health concern or that excessive pornography use can lead to adverse effects.

12.     Unfortunately, some of this criticism about Plaintiff and the Recovery Support Network has escalated into tortious and sometimes-illegal conduct, often by activists who have close connections to the pornography industry.

13.     One of these activists is a neuroscientist who publicly advocates for porn use and regularly collaborates with adult industry entities and executives, including from the porn industry's primary lobbying group (hereinafter, the "Activist"). Simultaneously, the Activist is a criminally convicted stalker who regularly targets people who raise awareness about porn addiction. Her primary tactic is defamation, presenting herself as a victim of her victims.

14.     Due to her tortious conduct, the Activist has been a defendant in several separate legal actions. For example, the Activist was sued by a neurosurgeon for reaching out to his university and medical licensing board with false allegations that he sexually harassed her, threatened her, stalked her, cyberstalked her, and falsified his credentials. Upon information and belief, the Activist has filed similar false reports with governmental agencies, law enforcement, employers, universities, publishers, and licensing boards against dozens of people. The case resulted in a settlement and the Activist retracting her false statements against the neurosurgeon.

15.     For years, the Activist habitually targeted Plaintiff and the Recovery Support Network. For example, the Activist would obsessively post defamation online using anonymous aliases, upon information and belief upwards of over 170 times in one day alone targeting her victims. Upon information and belief, the Activist has registered over sixty separate accounts on Wikipedia and has many other dozens of alias accounts across the Internet. The Activist utilized many such anonymous accounts to harass and defame Plaintiff. Additionally, the Activist purported to have submitted false reports against Plaintiff to governmental agencies falsely alleging criminal behavior and repeatedly contacted numerous people to spread false and defamatory information concerning Plaintiff. Plaintiff participated as one of nine victim-witnesses in the neurosurgeon's lawsuit against the Activist and was asked to submit an affidavit. A copy of Plaintiff's affidavit was sent to Defendant Azeff via email. See communications with Defendant Azeff, attached hereto as Exhibit A.

16.     Due to the Activist's escalating tortious conduct which was negatively impacting Plaintiff's life and compromising the Recovery Support Network's ability to continue operating, Plaintiff filed a lawsuit against the Activist and her company in October of 2019.

17.     A fundraiser was launched by the Recovery Support Network to help to pay for Plaintiff's legal bills. The fundraiser eventually recouped approximately $169,884.27 towards Plaintiff's legal costs, although Plaintiff's total legal costs far surpassed this amount. The Activist's tortious conduct and resulting legal expenses left Plaintiff in six figures of financial debt.

18.     Due to inconsistencies in allegations that Defendant Azeff was making against other family members, along with escalating discomfort with her behavior more generally, Plaintiff took a break from allowing communication with Defendant Azeff starting in November

2019. This decision was made under the advisement of a licensed therapist who holds a Ph.D. in psychology.

19.     After Plaintiff stopped allowing communication with Defendant Azeff, Defendant Azeff started to reach out to various people in Plaintiff's life to relay false and defamatory information concerning him.

20.     Upon information and belief, Defendant Azeff reached out to Plaintiff's girlfriend and her relatives to relay false and defamatory statements regarding him.

21.     Upon information and belief, Defendant Azeff contacted other individuals to relay false and defamatory information about Plaintiff.

22.     Plaintiff's lawsuit against the Activist settled under confidential terms on February 26, 2021.

## Defendant Azeff's Defamatory Publications

23.     Prior to the settlement, on or after January 14, 2021, Plaintiff first became aware of a defamatory "statement" written by Defendant Azeff (hereinafter, the "Defamatory Statement"). In her Defamatory Statement, Defendant Azeff purports to have first gotten in touch with the Activist by phone on August 07, 2020, which eventually led to Defendant Azeff joining the Activist in her defamatory campaign. Defendant Azeff's Defamatory Statement is by and large fictional and included a vast quantity of false, misleading, and defamatory statements about Plaintiff. It was produced by the Activist, pro se, within her bankruptcy, in response to a motion that a third party requested.

24.     Months later, on May 27, 2021, Defendant Azeff self-published a defamatory "book" online (hereinafter the "Defamatory Manifesto"). The Defamatory Manifesto made a vast quantity of false, misleading, and defamatory statements concerning Plaintiff, further building

upon her prior False Statements and making many new False Statements. The Defamatory Manifesto is presented as a memoir of Defendant's life but is largely fictional.

25. The Defamatory Manifesto republished the entirety of the Defamatory Statement's content as an appendix item, restating and widely disseminating each of the False Statements contained within it. See the Defamatory Manifesto, which includes a copy of the Defamatory Statement, attached hereto as Exhibit B.

26. The Defamatory Manifesto was listed online for a sale price of $24 and sold an unknown number of digital copies. As of January 25, 2022, the Defamatory Manifesto is still listed for sale.

27. The Defamatory Statement alleged that Plaintiff attempted to murder or otherwise physically harm Defendant Azeff, that Defendant Azeff has reasonable cause to fear for her life from Plaintiff's purported actions, and that Defendant Azeff has "not allowed" Plaintiff to be alone with her in any non-public space since the Spring of 2016 (the time of a purported incident in a garage) for her protection. Further, Defendant Azeff alleged that she put herself in harm's way, apparently preventing Plaintiff from committing mass murders on two separate occasions. Defendant Azeff's Defamatory Statement asserted that she is in immense physical danger of violence from Plaintiff.

28. Plaintiff has never attempted to murder or otherwise kill Defendant Azeff. Plaintiff has never committed or attempted to commit any act of violence against Defendant Azeff. Plaintiff has never attempted to physically harm Defendant Azeff in any way. Plaintiff has not once interacted with Defendant Azeff in a way that could be reasonably interpreted as violent or threatening. Plaintiff has never threatened Defendant Azeff in any way. Defendant Azeff has no factual or legitimate basis to be fearful of violence from Plaintiff.

29.     Plaintiff has never attempted to murder any crowd of people. Plaintiff has never attempted to fire a gun at any crowd of people or any person. Plaintiff has never pointed or aimed a firearm at any group of people or any person. Plaintiff has never attempted to murder or otherwise kill anyone. Plaintiff has never engaged in any activity which could be reasonably interpreted as attempting to murder, kill, or otherwise physically harm any person or group of people. Plaintiff has never planned to murder anyone or any group of people, nor has Plaintiff ever expressed any plan to murder anyone or any group of people. Plaintiff has never threatened to fire a gun at any person or any group of people. Defendant Azeff has never stopped Plaintiff from committing any act of physical violence or making any threat of physical violence.

30.     Plaintiff has provided extensive material evidence to counsel, including years of communications from Defendant Azeff herself such as emails, text messages, and voicemails, that thoroughly debunk most to all of Defendant Azeff's False Statements. Contrary to Defendant's assertions that she has not allowed Plaintiff to be alone with her in any non-public space since the Spring of 2016, the time frame of the purported attempted murder, Plaintiff has avoided and turned down numerous private meetings with Defendant Azeff that she has invited him to. For example, Defendant Azeff emailed Plaintiff asking him to stay in a hotel room with her for two nights in June 2019, which Plaintiff declined. Further, Plaintiff visited with Defendant multiple times alone, in non-public spaces, after 2016, including when he stayed overnight at her apartment while on a trip. See Exhibit A.

31.     The Defamatory Statement alleged that Plaintiff is antisemitic and otherwise holds discriminatory views towards Jewish people. The Defamatory Statement went so far as to claim that Plaintiff is not just vocally antisemitic, but violently antisemitic and was capable of being the perpetrator of the deadliest antisemitic mass shooting in the history of the United States, along

with purportedly telling Defendant Azeff that people will know that she is Jewish and that she should be fearful when "it is time to round you up again." The Defamatory Statement also claims that Plaintiff referred to Defendant Azeff as a "dirty Jew" and "cheap Jew."

32.    The Defamatory Manifesto elaborated on the Defamatory Statement's claims regarding antisemitism, purporting that Plaintiff was removed from a synagogue by Defendant for "uttering nasty comments about Jews." Defendant Azeff also claimed that she had a conversation with Plaintiff where she reminded Plaintiff that she "would not be considered White – as a lesser race Jewess – and, with whatever percentage blood that gave him … he too would be considered something that was not quite White."

33.    Both the purported incident at a synagogue and the conversation purported in the Defamatory Manifesto never took place.

34.    While not religious, Plaintiff is Jewish.

35.    The antisemitic statements alleged by Defendant Azeff never took place, nor has Plaintiff ever expressed or held antisemitic views.

36.    Sometime after the Tree of Life shooting, Plaintiff did have a conversation with Defendant where he shared that he was concerned about potential antisemitic violence, that violent extremists could determine that they are both Jewish, and that he was thinking about spending time living in Israel, which Defendant is intentionally mischaracterizing as antisemitic.

37.    Plaintiff has never referred to Defendant Azeff, or anyone else, privately, or publicly or in any capacity, as a "dirty Jew" or "cheap Jew," nor has Plaintiff ever used the phrase "Jew" as an insult or in a disparaging way.

38.    Plaintiff has never expressed an antisemitic view to Defendant Azeff, or anything that could be reasonably interpreted as an antisemitic view.

39.     Plaintiff has been to Israel multiple times, with his first visit in 2010, and has a history of being actively engaged in the Jewish community. Plaintiff has long followed many Jewish traditions, such as maintaining a kosher diet and often wearing a Star of David necklace.

40.     Plaintiff has spent time volunteering in Israel as an assistant tour guide for Taglit-Birthright Israel, where he led travel groups for Jewish young adults who were visiting the country for the first time. See photographs from Israel, attached hereto as Exhibit C.

41.     Plaintiff visited the Tree of Life synagogue shortly after the mass shooting to pay respects to the victims. Further, Plaintiff has made financial contributions to the synagogue rebuilding efforts.

42.     Plaintiff has received antisemitic death threats online and has frequently been a subject of antisemitic conspiracy theories. Further, Plaintiff has experienced discriminatory in-person incidents due to being Jewish.

43.     Despite having a strained relationship for many years, Plaintiff has sent and given Defendant Azeff presents, cards, and best wishes for many Jewish holidays. See Exhibit A.

44.     The Defamatory Statement alleged that Plaintiff is dangerous, speaks in threatening and deranged tones, owns an "arsenal" of five firearms, is irresponsible with firearms, took and intentionally withheld a firearm from another person, and is a danger to others (and particularly to women, who Defendant purports he is "capable of violence" towards).

45.     Plaintiff is not a violent or dangerous individual, nor is Plaintiff a risk to women. Plaintiff does not speak in threatening or deranged tones, nor does Plaintiff engage in such behavior.

46.     Plaintiff has never been charged with or convicted of any misdemeanor or felony.

47.     Plaintiff has never owned an arsenal and has never owned five firearms. Plaintiff has never acted recklessly, irresponsibly, or dangerously with a firearm. Plaintiff has never non-consensually taken, stolen, or otherwise withheld a firearm from anyone. Plaintiff has never broken, been charged with, or been convicted of any firearms-related crime.

48.     The Defamatory Statement alleged that Plaintiff is a conman and a fraudster who lied about using porn in his childhood and lied about having a problem with excessive porn use, making the entire basis of the Recovery Support Network illegitimate. To further demonstrate this assertion, the Defamatory Statement alleged that Plaintiff idolizes a well-known con artist, Frank Abagnale Jr.

49.     The Defamatory Manifesto elaborated on the Defamatory Statement's claims that Plaintiff is a conman who never struggled with porn addiction and built the Recovery Support Network on this purported "web of lies." Defendant Azeff referred to Plaintiff as a "Jewish conman" and that the Recovery Support Network "started as a joke." That Plaintiff created "Internet scams and sensations" and manipulated the media, including by lying that he struggled with porn use, creating "a fictitious backstory to prop up a sham business." According to Defendant Azeff, Plaintiff and his grandfather were "both grifters and conmen."

50.     Plaintiff does not engage in fraud and is not a conman or a grifter. Further, Plaintiff has never idolized Frank Abagnale Jr, nor does Plaintiff support fraudulent behavior.

51.     Contrary to Defendant's assertions, Plaintiff used Internet porn excessively since around the age of eleven years old.

52.     The Defamatory Statement alleged that Plaintiff lied to his girlfriend when he privately told her about being a survivor of childhood sexual misconduct and sexual abuse.

53.     Contrary to Defendant's assertions, Plaintiff is a survivor of sexual misconduct and sexual abuse that occurred in his childhood.

54.     Defendant Azeff has a history of expressing disapproval over Plaintiff sharing details about his childhood which Defendant Azeff does not approve of Plaintiff sharing. Defendant Azeff has previously claimed that Plaintiff disclosing details about his life has negatively impacted her career and purportedly resulted in a romantic rejection. According to the Defamatory Statement, Defendant Azeff purports to have first contacted the Activist just days after discovering that Plaintiff privately disclosed to his girlfriend that he was sexually abused as a child.

55.     The Defamatory Statement alleged that Plaintiff is violent, severely mentally ill, dangerously impulsive, sick and depraved, speaks in deranged tones, is emotionally and mentally disturbed, is dangerously unstable, has expressed long-held patterns of extremely disturbing behavior, has a long-reaching mental health background, has severe mental illness and personality disorders, lives a disturbing fantasy life, engages in furious rantings, has become irate with Defendant Azeff, engages in extremely disturbing conversation, and apparently has long-standing sleep issues, all while refusing treatment for a vast variety of purported mental health problems. Defendant Azeff evidenced these false claims by purporting that a therapist informed Plaintiff's father, Phillip Rhodes, that "people like this aren't made, they are born." Defendant Azeff further editorialized, claiming that Plaintiff is "capable of committing any sinister, manipulative, or otherwise dark act."

56.     The Defamatory Manifesto elaborated upon Defendant Azeff's mental health claims, falsely alleging that Plaintiff suffers from "untreated and severe mental health issues," experiences paranoia, "might be sociopathic," "lacks empathy," is "mentally and emotionally unstable," that "professionals" saw that Plaintiff had "realistic, clinical" mental health issues, that

a psychiatrist recommended that Plaintiff go to a "Hershey school," that it was "professionally recommended" that then-child Plaintiff should "be medicated and enrolled in a residential therapeutic treatment school for very disturbed children."

57.     Plaintiff does not have any mood or personality disorder, or any other diagnoseable mental health issue or disorder described by Defendant Azeff. This assertion is informed by routine psychological testing that Plaintiff has undergone in connection with his career and feedback from the two licensed professionals whom Plaintiff has undergone therapy with.

58.     Plaintiff is of a sound mind and not dangerously unstable, impulsive, deranged, disturbed, or otherwise mentally ill. While Plaintiff has incurred loss of sleep due to defamation, Plaintiff does not have any prior history of chronic sleeping issues.

59.     Plaintiff did temporarily attend therapy as a child several times, primarily due to his biological parents' divorce and child custody issues. According to Plaintiff's father (hereinafter, "Plaintiff's Father"), who purports to have been present at any mental health-related meetings that took place during Plaintiff's childhood, professionals informed both him and Defendant Azeff that Plaintiff does not have any diagnosable mental health issues. Plaintiff's Father asserts that the professional recommendations about medication or going to a treatment school that Defendant Azeff alleges never took place, unlike as purported in the Defamatory Manifesto. Both Plaintiff and Plaintiff's Father assert that Defendant Azeff is completely fabricating these false assertions about Plaintiff having a background of childhood mental health issues. Further, Plaintiff's Father confirms that Plaintiff has never had a "long-reaching mental health background" and that this was another fabrication by Defendant Azeff. See declaration of Plaintiff's Father, attached hereto as Exhibit D.

60.     The Defamatory Manifesto implied that Plaintiff is callous regarding sexual consent, purporting that he "muted" lessons about sexual consent. Further, Defendant Azeff purports Plaintiff's Father raped her, which resulted in Plaintiff being conceived. This particular claim has a defamatory imputation as Defendant Azeff repeatedly states that Plaintiff is genetically predisposed to violent, sociopathic, criminal, and fraudulent behavior – which is false and defamatory to Plaintiff directly. Further, Defendant Azeff claims that Plaintiff planned to "spin" Defendant Azeff's assertions of being a child sexual abuse survivor "to benefit [Recovery Support Network]'s backstory, saying specifically how this information would help him look like he truly cares about women."

61.     Due to the purported criminality of both Defendant Azeff's father and Plaintiff's father, Defendant Azeff purports that Plaintiff has a "criminal brain" with a "genetic propensity to such criminality." Defendant alleges that Plaintiff was engaged in "outright crimes," "various crimes," and that Plaintiff is a "criminal" and "perpetrator" who is "busy committing crimes." Defendant Azeff claims that she has attempted to "guide [Plaintiff] back to legality." Defendant Azeff alleges that Plaintiff, like his grandfather and his father, committed "crimes" and attempted to make Defendant Azeff "complicit" in them.

62.     Upon information and belief, Plaintiff was conceived through consensual sexual intercourse, not rape or any other form of sexual exploitation. This is informed by Defendant Azeff's prior descriptions of the period Plaintiff was conceived. Plaintiff is not predisposed to criminal behavior. Further, Plaintiff values and has openly advocated for sexual consent. Plaintiff is not a criminal. Plaintiff has never been charged or convicted of any crime, nor does Plaintiff engage in crimes. The conversation regarding Plaintiff's purported desire to "spin" Defendant's

purported background to benefit the Recovery Support Network never took place, nor has Plaintiff ever publicly disclosed Defendant's stories about her childhood.

63.     The Defamatory Statement alleged that Plaintiff had "rough shower sex" with an unnamed drunk woman in Tel Aviv, leaving her in an emergency room with a bleeding head. Defendant Azeff purports that she asked Plaintiff whether this person made a full recovery, where Plaintiff "laughed" and that "he would have no idea, that he didn't think he could even remember her name."

64.     In reality, while Plaintiff did have a consensual romantic encounter with a friend of his in a shower in Israel, and, indeed, she fell accidentally out of the shower, this friend of Plaintiff was not seriously injured, was not bleeding, and did not require an emergency room visit. Nor has Plaintiff ever had sexual intercourse with this person. After the incident, Plaintiff made sure that his friend was okay, accompanied her back to where she was staying, and followed up with her afterward. Plaintiff and this person remain on friendly terms to this day.

65.     The Defamatory Statement alleged that Plaintiff is an aspiring cult leader and holds "extremist values" around "slaves/minions." Defendant claims that Plaintiff purchased a house to be a compound for this purported planned cult.

66.     Plaintiff is not an aspiring cult leader, nor has Plaintiff ever planned to create a cult or become a cult leader, nor has Plaintiff expressed to Defendant anything that a reasonable person would believe is plans or a desire to create a cult. Plaintiff has never held or expressed extremist values around "slaves/minions." Plaintiff has never purchased or planned to purchase property for the purpose of starting a cult on it.

67.     The Defamatory Manifesto alleged that Plaintiff is funded by "wealthy Mormons who hate porn as much as he purported to hate it", that Plaintiff was "enjoying the riches of the

Mormon church, all while professing to be an atheist", and that Plaintiff described how "easy it was to get their support" and "mentioned his soft spot for Mormon millions." The Defamatory Manifesto further claimed that Plaintiff expressed to Defendant that he wants to raise children with homeschooling based on Christianity and stated that he wanted to "raise good Christian children."

68.     While the Recovery Support Network is thrilled to host a diverse community of people from a wide variety of backgrounds, including religious people of varying faiths, Plaintiff's Recovery Support Network is secular, and Plaintiff is not religious. Plaintiff or the Recovery Support Network has never received so much from a dollar from the Mormon church or Mormon groups, nor is the Recovery Support Network funded by any religion. Anti-porn addiction advocates frequently argue that porn addiction is not real and is just a moral conflict surrounding otherwise healthy porn use, often fueled by religious shame. The secular nature of the Recovery Support Network is a feature that differentiates it from morally- or religiously-based websites. Despite its secular origins, several porn advocates have endeavored to attempt to falsely link the Recovery Support Network to religion. Upon information and belief, Defendant Azeff published these false assertions regarding religious funding to add credence to such conspiracy theories, make Plaintiff look dishonest, and cause maximum reputational harm to Plaintiff and the Recovery Support Network. The conversations that Defendant alleged regarding "Mormon millions" and how "easy it was to get their support" never occurred. Upon information and belief, Defendant Azeff carefully crafted these false offensive conversations to discredit Plaintiff and the Recovery Support Network to both religious and secular audiences. Defendant's claims that Plaintiff purported to hate porn, or that he plans to raise children with Christian-based homeschooling and stated that he wanted to "raise good Christian children," are also untrue.

69.    The Defamatory Statement alleged that Plaintiff initiated a lawsuit against the Activist out of a desire for a "cash infusion" to purchase property, to obtain "easy money from other people's hard labor," jealousy that he didn't have a publicist and as much money as the Activist, that he wanted to "take her down," and that Plaintiff has made misogynistic and unsavory comments regarding the Activist during "endless, rage-filled diatribes," including but not limited to calling her a "bitch" and "c word causing him problems." In general, the Defamatory Statement characterized Plaintiff's case against the Activist as frivolous and baseless, and that Plaintiff has a history of vexatious litigation.

70.    The Defamatory Manifesto made further false statements regarding Plaintiff's litigation against the Activist. Defendant Azeff falsely characterized the Activist as being "punished by [Plaintiff]'s unquenchable wrath and greed." That the Activist is a "targeted victim" of Plaintiff and that this supposed "bullying" has a "chilling effect" on truth, science, and academic inquiry. The Defamatory Manifesto purported that Plaintiff has engaged in fundraising fraud, framing it as having questionable legality, and stated that the Activist does not have ties to the pornography industry. As the fundraiser specified that Plaintiff's lawsuit was against entities who have close ties to the pornography industry, upon information and belief, that is what Defendant Azeff was representing as fraudulent.

71.    Plaintiff didn't initiate the well-warranted lawsuit against the Activist for financial reasons but to put an end to extensive and obsessive tortious conduct that was significantly disrupting Plaintiff's life and the operations of the Recovery Support Network. Plaintiff has never described the Activist in a derogatory manner, including the two phrases starting with "b" or "c" purported by Defendant. Further, Plaintiff has never had a case dismissed and does not have a history of pursuing vexatious litigation. Plaintiff has never engaged in "endless, rage-filled

diatribes" about the Activist to Defendant Azeff. The Recovery Support Network's fundraiser was entirely legitimate, completely legal, and reviewed by attorneys prior to being launched, and it accurately described the Activist as having close ties to the pornography industry. The Recovery Support Network regularly works with scientists in the pursuit of further research on excessive porn use.

72.     Upon information and belief, many of Defendant Azeff's False Statements were an attempt to add credence to false and defamatory statements made by others such as the Activist. In prior emails, Defendant Azeff remarked on the Activist's assertions regarding Plaintiff, including but not limited to stalking, misogyny, antisemitism, supporting hate groups, and engaging in threatening behavior, accurately characterizing these statements as false and defamatory. For example, on June 04, 2019, Defendant Azeff described the Activist as "unstable mentally" who is engaged in "scheming and doing awful things BUT also planning to play the victim and rely on mental health or the like. That's just something I'm [']smelling['] if motions to dismiss and/or other procedural things fail and she has to face court some day". Defendant Azeff elaborated that "NOT ONLY is she hurting the men she accuses (YOU), she is equally hurting women with FALSE accusations." See Exhibit A.

73.     The Defamatory Statement alleged that Plaintiff traveled to Los Angeles with a firearm and body camera expecting to "encounter" the Activist, claiming that Plaintiff was a physical threat to the Activist. These false statements by Defendant Azeff led the Activist to repeatedly purport that Plaintiff attempted to murder her or otherwise confront her with a firearm.

74.     For example, in a declaration submitted pro se in her bankruptcy, the Activist stated that "[Defendant Azeff] is an attorney and [Plaintiff's] mother. [Defendant Azeff] reported witnessing [Plaintiff] travel across the country to Los Angeles, where he knew I lived, with a gun

and body camera. She said he stated his intention was to find me and 'confront' me, possibly by murdering me on video."

75.     Plaintiff has never possessed a firearm in the state of California. Plaintiff has never attempted to confront or otherwise be physically present near the Activist. Plaintiff has never desired nor expressed any desire or plans to be physically present near the Activist.

76.     Plaintiff traveled to Los Angeles only once in the past five years, between September 11 to September 12, 2019, in connection to his work with the Recovery Support Network. Unfortunately, the Activist became aware of this planned trip. The Activist attempted to interfere with Plaintiff's trip by falsely alleging that Plaintiff was subject to a restraining order and was stalking her. This incident was the last straw that led Plaintiff to file his defamation lawsuit against the Activist. Due to the Activist's history of fabricating false allegations, falsely accusing various people of stalking her, and filing false law enforcement reports, Plaintiff wanted to cancel the trip out of fear of false allegations of stalking. Eventually, after being talked into still going on the trip by various individuals, including Defendant, Plaintiff purchased a timelapse camera to act as an alibi for every second that he was in Los Angeles, in the event of false allegations of stalking. Defendant Azeff was aware of this and intentionally cast it in a defamatory and false light to further defame Plaintiff and interfere with his litigation against the Activist. Additionally, Plaintiff began the process of retaining counsel and preparing for upcoming litigation against the Activist prior to leaving for the trip to Los Angeles. See Exhibit A.

77.     Upon information and belief, false law enforcement reports regarding Plaintiff, falsely alleging that he traveled to Los Angeles to attempt to murder the Activist, have been purportedly submitted by the Activist as a direct result of Defendant Azeff's False Statements. If charged, a conviction for this purported crime that never took place could carry a maximum

sentence of life in prison. Plaintiff has yet to be contacted by any law enforcement agency regarding the false accusations made against him, including the purported attempted murder, and no charges have ever been filed.

78.     The Defamatory Statement painted a caricature of Plaintiff being delusional, egotistical, controlling, narcissistic, unempathetic, and an elitist snob who described himself as "the best looking person anyone had ever seen" and good looking, and described people who "have to work for a living" as "trash." Defendant Azeff claims that Plaintiff referred to her as "a loser who had to work for a living" and spoke "incessantly" with her about how "good looking, talented, and famous he was" while disparaging Defendant Azeff as the opposite of those things. Defendant Azeff went so far as to falsely claim that a funeral cost fundraiser that Plaintiff hosted for an online friend who passed away was motivated to make Plaintiff "look really good on the Internet."

79.     The Defamatory Manifesto elaborated on the Defamatory Statement's claims that Defendant Azeff is somehow a victim of bullying and threats from Plaintiff. The Defamatory Manifesto claims that Plaintiff is a bully who "threatened" Defendant Azeff "into silence." Defendant Azeff claims that Plaintiff called her a "libtard and an SJW". As such, Defendant Azeff claims that she is somehow at risk from Plaintiff engaging in "Internet bullying, nuisance litigation, and/or bullets through [her] body" for writing her Defamatory Statement and Defamatory Manifesto, posing herself as a whistleblower of Plaintiff's purported activities. Finally, Defendant Azeff claims that both Plaintiff and his father called Defendant Azeff a "dirty Jew, a gypsy, a loser, a bitch, or a woman whose own family did not even want her."

80.     None of the aforementioned purported statements by Plaintiff from the Defamatory Manifesto are true and the events alleged never took place.

81.     The conversations where Defendant Azeff alleged Plaintiff described Defendant Azeff as "trash" or "a loser who had to work for a living," and described himself as detailed above in the Defamatory Statement and described that an online fundraiser would make him look good never took place.

82.     The Defamatory Statement describes Plaintiff as a bully who silences those who criticize him, behaves belligerently, and engages in various unsavory search engine optimization methods to obsessively promote himself.

83.     The Defamatory Manifesto elaborated on the Defamatory Statement's claims regarding bullying others, falsely alleging that Plaintiff bullied journalists, forced a journalist to sign a non-disclosure agreement, and engages in manipulation to get journalists to "accept without even so much as a hint of fact checking anything he concocted." Defendant Azeff purports that the media has enriched Plaintiff.

84.     Plaintiff has not engaged in unsavory, illegal, or "black hat" promotional tactics to raise awareness about himself or the Recovery Support Network. Plaintiff has not bullied any journalist, manipulated any journalist, or forced any journalist to sign a non-disclosure agreement. The Recovery Support Network has regularly worked with journalists and television producers in a professional context, including from the New York Times, CNN, the Washington Post, NPR, TIME Magazine, the BBC, and many other outlets. Plaintiff does not behave belligerently and does not bully or engage in illegal or unethical behavior to silence people who criticize him.

85.     The Defamatory Statement alleged that Plaintiff engages in tax evasion.

86.     The Defamatory Manifesto elaborated on the Defamatory Statement's claims regarding tax evasion, purporting that Plaintiff "practiced the arts of tax evasion" "for years."

87.     Plaintiff does not engage in tax evasion, nor has Plaintiff ever knowingly engaged in tax evasion.

88.     The Defamatory Statement alleged that Plaintiff has bullied and threatened the Defendant, acting like a "tyrant", and referred to her as an "old bitch", "white trash", a "lower value person", a "libtard", and "many other derogatory terms." Defendant further elaborates, claiming that Plaintiff has engaged in "toxic narcissistic abuse patterns" and has supposedly been "verbally vicious with [Defendant] on countless occasions… without provocation."

89.     Plaintiff has never referred to Defendant Azeff by any of the ascribed terms. Plaintiff has never bullied Defendant Azeff or threatened Defendant Azeff in any way. Plaintiff has not engaged in abusive conduct in any form against Defendant Azeff, nor has Plaintiff ever been verbally vicious with Defendant Azeff at any time.

90.     The Defamatory Statement alleged that Plaintiff set up a store on eBay to sell counterfeit bags.

91.     When Plaintiff was a minor, he occasionally sold wholesale items, books, and used merchandise on eBay. While Plaintiff has gifted Defendant a bag that Defendant purported to be non-authentic, Plaintiff has never set up a store on eBay to sell counterfeit bags and has never knowingly sold counterfeit bags online.

92.     The Defamatory Statement alleged that Plaintiff imported an illegal substance into the United States.

93.     Plaintiff has never imported an illegal substance into the United States. Nor has Plaintiff ever had any involvement in the trafficking of any narcotic.

94.     The Defamatory Statement alleged that Plaintiff was "running an illegal botting endeavor." Defendant Azeff further alleged that Plaintiff has engaged in various unsavory

measures to cover up a supposed real and somehow relevant "backstory" involving World of Warcraft and being an extra in a movie.

95.     While Plaintiff did play World of Warcraft, and eventually utilized a tool to automate gameplay while he was a minor, doing so was not illegal in any way. Plaintiff has never engaged in an illegal botting endeavor. Nor has Plaintiff ever attempted to hide that he played World of Warcraft excessively or eventually automated World of Warcraft gameplay, nor has Plaintiff ever attempted to hide that he was an extra in a movie.

96.     The Defamatory Statement alleged that Plaintiff holds discriminatory and extremist views and values, including but not limited to that Plaintiff is a misogynist, that Plaintiff hates women, that Plaintiff has said misogynistic statements against numerous people, that Plaintiff has a "long-standing pattern of hatred against women," that Plaintiff has regularly utilized the word "bitch" to describe women, that Plaintiff has referred to a female politician as "old" and "ugly," and that Plaintiff is a physical danger to women and people with "other gender identities" which "he does not approve." Defendant Azeff further claimed that Plaintiff has extremist values surrounding "race, sex, firearms, cults, slaves/minions, politics, social orders, and other areas."

97.     Among other false, misleading, and defamatory statements, the Defamatory Manifesto alleged that Plaintiff has expressed discriminatory views. Defendant Azeff purported that Plaintiff voiced support of a controversial group known as the "Proud Boys," which has been classified as a hate group by the Southern Poverty Law Center. Defendant Azeff claims that Plaintiff supports this group, "despite his fear that his biological maternal Jewish lineage was easily traceable." Defendant Azeff claims that Plaintiff has complained to her on many phone calls about how difficult it was for him and "all other White males, considering all that had been taken from them." Defendant Azeff claims that Plaintiff expressed "paranoia about and fury over how hard it

was for White males in his generation," particularly "straight white males." Defendant Azeff further claims that Plaintiff and his father decided together to pursue litigation against her when he was approximately 11-12 years old, because the "diversity and roughness of the public schools were too uncomfortable for [Plaintiff]." Finally, Defendant Azeff claims that Plaintiff is "wooed by hate" and "would later strongly disdain other emerging genders, people in transition, and several additional groups of others."

98.     Plaintiff is not a misogynist and has never expressed or held a hatred of women. Plaintiff has never engaged in discriminatory behavior, nor is Plaintiff a danger to others. Plaintiff does not use the word "bitch" to describe women. Plaintiff has never possessed or espoused extremist or discriminatory values. Plaintiff has never referred to a politician as "old" or "ugly." Plaintiff is openly affirming of LGBTQ+ people and has a long history of engaging in LGBTQ+ culture and events such as Pride Month and fundraisers.

99.     Plaintiff does not support, nor has he ever supported, the "Proud Boys" group. The purported conversations about "White males" and the "Proud Boys" alleged by Defendant never occurred. Plaintiff never participated in the planning of any child custody litigation against Defendant Azeff when he was a minor, nor did he ever express that the purported diversity and roughness of public schools was too uncomfortable for him.

100.    The Defamatory Statement alleged that Plaintiff is an abuser of women, who manipulates women for profit, who doesn't contribute towards joint expenses in relationships, who cons women for their money, who isolates and controls women, who supports violence against women, who has swindled exes out of thousands of dollars, who bullies women, and has an ex who had to be pulled out of school to get away from Plaintiff. Further, Defendant Azeff purports that Plaintiff cheated on a woman he was dating in 2019.

101.    The Defamatory Manifesto elaborated on the Defamatory Statement's claims regarding abusive behavior. Among other similar statements, Defendant Azeff wrote that Plaintiff has engaged in "past abuses" "against other females." That Plaintiff is a controlling "abuser" who has a pattern of "targeting and profiting off of women." That Plaintiff's girlfriend was "demeaned, bullied and separated from her family." That Plaintiff oppressed and isolated his girlfriend "separated at home from the real world." That Plaintiff "when not outright bullying" could "also be such a charming abuser, particular of women." That Plaintiff financially defrauded partners, including lying to them about his finances. That Plaintiff cheated on a partner. That Plaintiff long left a partner alone during a medical emergency and barred her from "going to the home and safety of her own parents." That Plaintiff "knowingly and calculatingly takes advantage of women."

102.    Plaintiff has not abused any woman or partner, has not prohibited anyone from going anywhere, has not abusively isolated or controlled anyone, has not financially defrauded a partner, has not misrepresented his finances to any partner, did not leave his partner alone during a medical emergency for hours and then bar her from leaving home, has not engaged in abuses against females, has not targeted any woman for financial exploitation, and did not cheat on the partner as purported by Defendant Azeff. If Plaintiff had ever borrowed money from a romantic partner, such loans would be paid back in full. Plaintiff does not support dishonest behavior in romantic relationships. Plaintiff has never defrauded a romantic partner or otherwise exploited a romantic partner for money. Further, Defendant Azeff was well aware that Plaintiff was experiencing financial troubles for much of 2019, primarily due to tortious conduct from the Activist. See Exhibit A.

103.    The Defamatory Manifesto alleged that Plaintiff committed two insurance fraud schemes. Defendant Azeff claims that Plaintiff lied to a police officer about speeding after a car

accident, which led to an insurance company compensating him. Further, Defendant Azeff claims that Plaintiff lied to authorities to help his father defraud an insurance company.

104.    Plaintiff has never defrauded any insurance company, has never lied to a police officer, has never lied to an insurance agent, and has never lied to any fire investigator in the course of their duties as purported by Defendant Azeff. There was indeed a house fire at Plaintiff's father's house, which was a non-intentional and dangerous fire that Plaintiff, who was nearly trapped in the attic, narrowly escaped from.

105.    Both the Defamatory Statement and Defamatory Manifesto were largely fictional and contained an extensive number of other false, misleading, and defamatory statements and imputations concerning Plaintiff.

106.    Upon information and belief, the Defamatory Statement was unsigned and, notably, not sworn to under penalty of perjury. Upon information and belief, Defendant Azeff didn't swear to her Defamatory Statement under penalty of perjury to avoid any potential legal liability for committing perjury.

107.    By contacting the Activist, a defendant in highly contentious litigation, to provide false and defamatory information concerning Plaintiff, Defendant Azeff significantly interfered with legal proceedings in the Western District of Pennsylvania and caused Plaintiff extensive damages. Defendant Azeff's actions, along with the Defamatory Statement, emboldened the Activist to make numerous more false and defamatory statements concerning Plaintiff publicly and within the various other legal actions she is involved in.

**Continued Tortious Conduct by Defendant Azeff**

108.    In addition to the False Statements contained within the body of the Defamatory Manifesto, the Defamatory Manifesto contained "Appendices," bringing to light further tortious actions by Defendant Azeff.

109.    In her Defamatory Manifesto, Defendant Azeff revealed that she purportedly collaborated in providing information about Plaintiff to a private investigation firm, CoventBridge Group Ltd, retained by the Activist to "investigate" Plaintiff. According to Defendant Azeff, an investigator named Matthew Bernstein from CoventBridge Group Ltd traveled to her location in Washington to interview her. See Exhibit B.

110.    Upon information and belief, CoventBridge Group Ltd, or another agency hired by the Activist, her counsel, or other entities connected to the Activist, likely deployed an in-person private investigator to surveil Plaintiff. This determination was made by a professional security company that provides home security, consulting, and close protection services to Plaintiff.

111.    In the Defamatory Manifesto appendices, Defendant Azeff included an email that she purportedly sent to four email inboxes at the New York Times, also copying counsel and a private investigator for the Activist. This email, dated February 11, 2021, restated many of her False Statements. Further, the February 11, 2021 email purports that she had previously contacted a New York Times journalist to relay false and defamatory information concerning Plaintiff. Upon information and belief, Defendant Azeff attached her Defamatory Statement to the email. See Exhibit B.

112.    In the Defamatory Manifesto appendices, Defendant Azeff included an email that she purportedly sent to CNN. This email, dated March 30, 2020, restated many of her False Statements. Further, the March 30, 2020 email purports that Defendant Azeff had previously emailed CNN regarding Plaintiff. See Exhibit B.

113.    In the Defamatory Manifesto appendices, Defendant Azeff included an email that she purportedly sent to the Activist's counsel and private investigator. In Twitter postings on February 01, 2021, the Activist claimed to have been inappropriately grabbed by a young man carrying a skateboard in Los Angles on October 09, 2019. Defendant Azeff's email, dated February 03, 2021, falsely claimed that Plaintiff could have committed or otherwise been involved with this purported assault on October 09, 2019, in Los Angeles, many hundreds of miles away from his location. See Exhibit B.

114.    Plaintiff was not in California once throughout the entire month of October 2019, nor was Plaintiff aware of or involved in any way with any purported assault. Defendant knew that Plaintiff was not in California in October of 2019.

115.    Throughout the entire month of October 2019, Plaintiff was assisting in caring for a person dying of pancreatic cancer who was in hospice.  Plaintiff discussed this care with Defendant Azeff at the time.

116.    In the Defamatory Manifesto appendices, Defendant Azeff included an email that she purportedly sent to a blogger from an activism blog (hereinafter, the "Activism Blog") that previously published false and defamatory information provided to them by the Activist. For example, the article stated that the Recovery Support Network's fundraiser led to the Activist receiving death threats, despite the Activist, after obtaining prior notice of the upcoming fundraiser, claiming that it resulted in her receiving death threats 22 minutes before it actually went live. Shortly after the Activist Blog published the defamatory article, Plaintiff retained additional counsel and pursued a legal claim against the Activism Blog. The dispute eventually resulted in a settlement where the Activism Blog fully retracted the defamatory article and issued an apology. In this email, dated February 03, 2021, Defendant Azeff restated many of her False Statements.

Further, Defamatory Manifesto claimed that the Activism Blog's defamatory article sourced by the Activist was "actually true." Upon information and belief, this email by Defendant Azeff was an attempt to interfere with the settlement agreement reached between Plaintiff and the Activism Blog. See Exhibit B.

117.   On May 20, 2021, a friend of Plaintiff passed away (hereinafter "Plaintiff's Friend"). Plaintiff's Friend was an author and advocate who raised awareness about porn addiction. As such, Plaintiff's Friend was a victim of obsessive and near-daily conduct perpetrated by the Activist, spanning since 2013. Upon information and belief, Plaintiff's Friend's death was directly caused by the Activist's extensive cyberbullying, cyberstalking, harassment, and defamation. Plaintiff's Friend's death was announced by Plaintiff and others on May 21, 2021. Plaintiff and others published Plaintiff's Friend's obituary on May 26, 2021. Defendant Azeff knew that Plaintiff's Friend was a friend of Plaintiff and that Plaintiff's Friend was a targeted victim of the Activist. See Exhibit A.

118.   After Plaintiff's Friend's death, the Activist conducted actions to harass Plaintiff and others who knew Plaintiff's Friend, including signing up for the Recovery Support Network on a new alias account to relay messages to Plaintiff celebrating Plaintiff's Friend's death. These communications included "good riddance" and "the world is better for his death." After Plaintiff co-wrote and co-published Plaintiff's Friend's obituary, upon information and belief, the Activist attempted to get the obituary removed by contacting the press release distribution service. Further, upon information and belief, the Activist impersonated a copyright holder to issue a fraudulent DMCA takedown notice to censor a tribute video that featured friends of Plaintiff's Friend, celebrating his life. A Twitter account purporting to represent the Activist and her associates posted that "everyone was so excited" to hear that Plaintiff's Friend "was no longer around."

119.    Upon information and belief, Defendant Azeff specifically chose May 27, 2021, to self-publish her Defamatory Manifesto to exert maximum distress onto Plaintiff, knowing that he would be mourning the loss of Plaintiff's Friend. Upon information and belief, Defendant Azeff intentionally timed much of her tortious activity to inflict maximum distress onto Plaintiff.

120.    On and after June 03, 2021, Defendant Azeff took to social media to reach out to a wide variety of individuals and organizations, including Plaintiff's colleagues, therapists, porn industry operatives, and porn activists, to relay false and defamatory information concerning Plaintiff, restating her False Statements, making novel False Statements, and specifically targeting her communications to exert reputational damage to Plaintiff. See screenshots, attached hereto as Exhibit E.

121.    On or around June 04, 2021, Defendant Azeff changed her company's Twitter account's cover image to advertise Defendant Azeff's Defamatory Manifesto, which was selling for $24. In some of her Twitter postings, Defendant Azeff linked to where to purchase the Defamatory Manifesto. In Twitter postings, Defendant Azeff posed herself as a besieged whistleblower, stating that Plaintiff has initiated a "massive SLAPP" suit against her. Her Twitter postings describe that now that counsel for Plaintiff informed her of potential litigation, she was now suddenly inspired to "come forward" publicly with her False Statements regarding Plaintiff. Defendant Azeff went on to publish hyperbolic and ridiculous statements such as "Game over, [Recovery Support Network]. Shouldn't have attacked your mother (IRL, psychologically, and now with an overtly manipulative and massive SLAPP suit). Facts aren't on your side. I refuse to be silenced by your bullying any longer." See Exhibit E.

122.    On June 04, 2021, Defendant Azeff announced on her company's Twitter account that she is working on a website to promote and more widely disseminate the Defamatory

Manifesto. According to public registry details, the domain name was registered via the registrar NameCheap.com on March 25, 2021. As of January 14, 2021, the website homepage has not yet publicly hosted content outside of a "Coming soon" banner.

123.    On June 05, 2021, Defendant Azeff posted to Twitter that "a brave Soul came forward today to let me know that [Plaintiff] (w/another well known anti-porn extremist) threatened her life." Another Twitter communication by Defendant Azeff purported that Plaintiff has engaged in a "rampage of death threats." See Exhibit E.

124.    Plaintiff has never made a threat against another person's life. Plaintiff has never directed anyone to make a threat against another person's life. Plaintiff is not aware of anyone he has collaborated with whom has made a threat against another person's life. Further, Plaintiff is not "anti-porn" nor an "extremist."

125.    On May 25, 2021, Defendant Azeff was served with a confidential settlement offer at her residence in Olympia, Washington. On June 06, 2021, Defendant Azeff responded to counsel for Plaintiff via email, rejecting the confidential settlement offer in its entirety, refusing to enter into settlement negotiations, and threatening various forms of harassment, defamation, and legal obstruction to continue her course of tortious conduct. Further, Defendant Azeff threatened to weaponize the discovery process to publicly disseminate private details concerning Plaintiff.

126.    On June 09, 2021, Plaintiff accidentally added the email address of Defendant Azeff, rather than the email address of his attorney, in a private client-attorney correspondence. In the email, Plaintiff requested that a paralegal periodically preserve the content of Defendant Azeff's website via Page Vault. In response, on June 09, 2021, Defendant Azeff took to Twitter to claim that this email was Plaintiff instructing Minc Law to "hack" her website. Defendant Azeff

elaborated that her email window purportedly closed, and therefore, Plaintiff is hacking her computer. See Exhibit E.

127.   Plaintiff has never instructed anyone at Minc Law, or anyone anywhere, to hack the website or any data owned or operated by Defendant Azeff, or to hack anyone else. Plaintiff has never hacked, attempted to hack, or otherwise illegally accessed any device owned by Defendant Azeff.

128.   On June 14, 2021, counsel for Plaintiff was contacted by an individual named Doug Allen, who claimed that Defendant Azeff contacted him to relay false and defamatory information concerning Plaintiff. Doug Allen alleged that Defendant Azeff stated that Plaintiff committed crimes in connection to a mass shooting that occurred in 2009. Doug Allen's email purports that he planned to relay Defendant Azeff's False Statements about Plaintiff to law enforcement, including the FBI and Allegheny County Police Department.

129.   According to Doug Allen's email, Defendant Azeff first contacted him on May 29, 2021, and later followed up via email on June 09, 2021, alleging, among other things, that Plaintiff hacked into a mass shooter's email account, that Plaintiff compiled the mass shooter's "murder diary" leading up to the night of the mass murder, that Plaintiff was in close proximity to the murders and that he might have first met the mass murderer through his father, and that Plaintiff then published the "murder diary" on a new web page the night that the mass shooting took place.

130.   Defendant Azeff made Twitter postings further elaborating on her False Statements regarding a 2009 mass shooting, falsely claiming that Plaintiff "created an entire SubReddit discussion, AMA, and independent website within mere hours of the shooting…" and that Plaintiff "was thoroughly obsessed with the same things [the mass shooter] was at the same time" and

"conceived [the Recovery Support Network] on several similar principles" and that "[the Recovery Support Network] [is a] breeding ground for misogynists."

131.    Plaintiff has never hacked, attempted to hack, or otherwise accessed the email account or personal data of the mass shooter George Sodini. Plaintiff has never met or had any communication of any kind with George Sodini. Plaintiff did not have any prior knowledge of the mass shooting. Plaintiff was not a secret second gunman or accomplice who assisted in murdering a group of people in a fitness facility in 2009. Plaintiff has never worked with a mass shooter to plan or otherwise aid in perpetuating a terrorist act or mass killing. Plaintiff did not discover firearm receipts or any other private evidence or data related to the mass shooting. Plaintiff did not compile a mass shooter's "murder diary" or publish or republish any "murder diary" online. Plaintiff did not have a Reddit account or otherwise post on Reddit at any time in the year 2009. Plaintiff has never secretly appeared in a media outlet as a Canadian computer hacker. See Doug Allen's email and counsel for Plaintiff's response, attached hereto as Exhibit F.

132.    The Recovery Support Network's usership is incredibly diverse from many countries around the world. The Recovery Support Network openly advocates against discrimination and works hard to make recovery resources inclusive and accessible to everybody, including to the thousands of women who utilize it. Anyone with Internet access can register and post messages to the Recovery Support Network, but they do have to abide by a published list of policies. Among these policies, the site explicitly bans discriminatory statements (including misogyny) and hate speech.

133.    Doug Allen's communications purported that he was included in an email thread started by Defendant Azeff that included the Activist and a collaborator of the Activist (hereinafter, the "Activist's Friend"). The Activist's Friend is an outspoken porn advocate, therapist, author,

blogger, and activist who has extensive connections to the pornography industry, including its primary lobbying group and executives from the largest porn websites. The Activist's Friend has frequently collaborated with the Activist to defame and harass Plaintiff. Their conduct is often amplified by other complicit and (inadvertently by) unaware third parties who extensively republish defamatory statements concerning their victims online. Such conduct has led to mental suffering for their victims, extensive financial damages, threats, safety risks, and now the loss of life.

134.    On April 08, 2021, the Recovery Support Network received an email from the Activist's Friend stating that he was "writing a piece about lawmakers and activists who advocate for limiting access to pornography, but defend access to gun rights" and "was given a statement by [Plaintiff's] mother Althea Azeff that he has an 'arsenal of firearms. I'm inviting [Plaintiff] to comment on this, or on gun ownership."

135.    Plaintiff has never advocated for or offered comment on "gun rights" and does not own an arsenal of firearms. Plaintiff has never advocated for any government to limit access to pornography, nor is Plaintiff an anti-porn activist. Upon information and belief, this April 08th email was an attempt by the Activist's Friend to widely disseminate Defendant Azeff's False Statements.

136.    Further, the Activist's Friend has openly interacted with and "retweeted" and "liked" postings from Defendant Azeff's Twitter account to knowingly disseminate the False Statements to his audience of almost 20,000 followers. This resulted in Defendant Azeff's Twitter account being "followed" by porn activists and even an executive from the porn industry's primary lobbying group.

137.   Upon information and belief, Defendant Azeff established communication and has coordinated with Plaintiff's harassers and defamers, some of whom are connected to the porn industry, including but not limited to the Activist and the Activist's Friend, to exert maximum possible damage onto Plaintiff.

138.   On June 18, 2021, Defendant Azeff posted to Twitter claiming that Plaintiff "and/or co-conspirators" "attempted (4 times) to hack my web dev's Gmail. He is hell-bent on silencing me. My website, not about him, is under attack. And the web developer under attack. And it's pre-go live. Wow." See Exhibit E.

139.   Plaintiff has never hacked or otherwise illegally accessed data from any website or web server. Plaintiff has never hacked or otherwise attempted to hack, obtain private data from, or otherwise electronically attack Defendant Azeff's website or any email account owned by Defendant Azeff or her web developer. Plaintiff does not know who Defendant Azeff's purported web developer is, nor does Plaintiff have any knowledge about any purported attempts to hack her website or the data of her purported web developer.

140.   On June 27, 2021, Defendant Azeff posted to Twitter claiming that Plaintiff was hacking her phone. Upon information and belief, the June 27 phone screenshot depicts Defendant Azeff utilizing a virtual private network ("VPN"), as shown by the VPN icon on the upper-right of her screenshot, which appears to have resulted in Google serving a CAPTCHA. Upon information and belief, CAPTCHA requests by Google are routine when connecting to the search engine through a VPN service, and Defendant Azeff's screenshot is not evidence of her phone being hacked, let alone by Plaintiff. See Exhibit E.

141.   Upon information and belief, Defendant Azeff attempted to contact Plaintiff's Father via two blocked calls during the night of May 24, 2021. On October 29, 2021, Defendant

Azeff contacted Plaintiff's Father by using a blocked phone number. After he picked up, he immediately hung up after becoming aware of who the caller was. Upon information and belief, Defendant Azeff might have attempted to reach out to Plaintiff via blocked calls or anonymous accounts online.

142.    While secretly sabotaging Plaintiff's life and relationships by contacting the Activist and numerous other individuals with the False Statements concerning him, Defendant Azeff repeatedly attempted to reach out to reestablish contact with Plaintiff as recently as October 2020, over two months after she purports to have first contacted the Activist. See Exhibit A.

143.    On February 04, 2021, many months after her tortious campaign initiated, Defendant Azeff applied for a legal writing position at the law firm representing Plaintiff, which upon information and belief, was to either establish contact with Plaintiff or interfere in his affairs.

144.    Upon information and belief, Defendant Azeff has a modus operandi of making false and defamatory statements against others, including but not limited to family members, employers, coworkers, prior friends, and landlords.

145.    Defendant Azeff published all of the False Statements despite knowing they were false or showing extreme disregard for the truth of the False Statements.

146.    The False Statements have been published with malice, in an attempt to harass, embarrass, and discredit Plaintiff personally and professionally.

147.    Upon information and belief, Defendant Azeff published the False Statements maliciously and in direct retaliation to Plaintiff ending his relationship with Defendant Azeff and disclosing his history of being subjected to childhood sexual abuse to a third party. Defendant Azeff purports that she first contacted the Activist just days after discovering that Plaintiff privately shared that he was sexually abused as a child with his partner. Defendant Azeff has an

established history of lashing out in response to Plaintiff sharing information concerning his childhood with third parties.

148.    Upon information and belief, Defendant Azeff posted her False Statements in an attempt to spur on entities which had previously harassed Plaintiff, including contacting the Activist and the Activist's Friend.

149.    Upon information and belief, the Defamatory Statement was widely republished online by the Activist or Defendant Azeff. For example, the Defamatory Statement was republished online approximately 80 times by a Fiverr.com service provider, which upon information and belief, was hired by the Activist or Defendant Azeff. See Exhibit E.

150.    Defendant Azeff's malice and motivation for fabricating the False Statements are further demonstrated by her extensive degradation of Plaintiff's character. For example, in her Defamatory Manifesto, Defendant Azeff went so far as to state that she regrets not choosing to have Plaintiff aborted.

151.    Upon information and belief, Defendant Azeff has a modus operandi of fabricating false and defamatory allegations against individuals who have wronged or she believes have wronged her. The Defamatory Manifesto contained a wide variety of claims against various individuals, including:

a.  **Phillip Rhodes:** Defendant Azeff claims that Phillip Rhodes, her ex-husband and the father of Plaintiff, raped her. Defendant Azeff further claims that Phillip Rhodes was engaged in tax evasion, expressed early criminal tendencies, was engaged in "not-so-legal" behaviors, is antisemitic, referred to her as a "dirty Jew" and "gypsy" and "loser" and "a woman whose own family did not even want her", and encouraged her to massage men while wearing lingerie. See Exhibit B.  Phillip Rhodes adamantly denies these claims, and Plaintiff

observed Defendant Azeff express significant inconsistencies in her allegations against Phillip Rhodes.

b. **Maureen Scott:** Defendant Azeff claims that Maureen Scott, the mother of Phillip Rhodes and her ex-mother-in-law, is antisemitic. Defendant Azeff contended that the first time she met Maureen Scott, Maureen Scott checked Azeff's head for horns, thinking Jewish people have horns. See Exhibit B. Both Maureen Scott and Phillip Rhodes deny that this ever happened. Plaintiff further alleges that he has never witnessed Maureen Scott express an antisemitic view.

c. **Gloria Amann:** Gloria Amann is the biological mother of Defendant Azeff. Defendant Azeff claims that Gloria Amann threatened to kill her, threatened to stab her in the neck, was verbally abusive, instructed her on how to kill herself, and attempted to kill her dog. See Exhibit B. Gloria Amann is now deceased and unable to offer comment.

d. **Daniel Dubro:** Defendant Azeff claims that Daniel Dubro, her biological father, engaged in various unethical behaviors. Defendant Azeff purports that he raped her biological mother, resulting in her birth. Defendant Azeff purports that he was an abuser of women and a lifelong conman. See Exhibit B. Daniel Dubro is now deceased and unable to offer comment.

e. **Gertrude "Trudi" Azeff:** Defendant Azeff claims that her adoptive mother, Gertrude Azeff, issued death threats to her, was emotionally abusive, was complicit in sexual abuse, stole large amounts of money from her via forgery, and instructed her on how to kill herself. See Exhibit B. While Plaintiff does not have direct knowledge related to these allegations, Gertrude Azeff categorically denies them.

f. **Joel Azeff:** Defendant Azeff claims that her adoptive father, Joel Azeff, systemically sexually abused her throughout her childhood, including sex trafficking her to other men, forcing her to have sex with dogs and her adoptive brothers, filming child sexual abuse videos, and raping her. See Exhibit B. While Plaintiff does not have direct knowledge related to these allegations, Joel Azeff categorically denies them.

g. **Deloitte:** In her Defamatory Manifesto, Defendant Azeff claimed to be subjected to misogynistic and antisemitic bullying at a Fortune 100 consultancy in her early 40s, claiming that she was denied opportunities and was overworked due to her age, being an "adoptee," not having a family to visit during holidays, "nose size" and "being generally unattractive." See Exhibit B. After being terminated from both Deloitte and the company she worked at afterward, DLA Piper, Defendant Azeff claimed to be a victim of various conspiracies to remove her.

152.   The False Statements were directed to Plaintiff, and the greatest harm suffered by Plaintiff, in the Western District of Pennsylvania.

153.   As a direct and proximate result of Defendant Azeff's publication of the False Statements, Plaintiff has been harmed and continues to be harmed. Plaintiff has suffered extreme forms of distress because of the harassment and defamation that he has been subjected to, including mental anguish and suicidal ideation. Plaintiff has had to meet with a therapist as a direct and proximate result of Defendant's actions and publication of the False Statements.

154.   Plaintiff has spent significant legal costs addressing third-party inquiries regarding the False Statements. Plaintiff has successfully prevented further publication of the False Statements through these efforts. However, these inquiries and the possibility of further

publication of the False Statements have caused additional damage to Plaintiff, including increasing Plaintiff's mental anguish and distress.

## Counts I, II, III, IV: Defamation – Libel Per Se, Liber Per Quod, Slander Per Se, Slander Per Quod

155.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-154 as though set forth fully herein.

156.    Defendant Azeff published and re-published the False Statements of and concerning Plaintiff on the Internet, and other mediums, asserting and creating the false impression that, among other things, Plaintiff has engaged in a wide variety of illegal, violent, criminal, fraudulent, unsavory, threatening, discriminatory, abusive, unethical, and immoral behaviors.

157.    The False Statements contained therein tend to harm the otherwise good reputation of Plaintiff as to lower them in the estimation of the community or to deter third persons from associating or dealing with Plaintiff.

158.    The False Statements contained therein ascribe to Plaintiff's conduct, character, and conditions that adversely affect his fitness for the proper conduct of his business, trade, and profession.

159.    The False Statements contained therein have grievously fractured Plaintiff's standing in the community of respectable society by producing a negative impression of Plaintiff in the minds of the average persons among whom the False Statements are intended to circulate.

160.    Defendant Azeff published the False Statements without privilege, authorization, or consent.

161.    The False Statements constitute libel per se as they are false, defamatory, impugn Plaintiff's reputation, impute criminal conduct to Plaintiff and injuriously affect Plaintiff's business name and trade.

162.    Plaintiff is informed and believes, and upon that basis, alleges that the False Statements were written and published with actual malice in that the False Statements were made with knowledge of their falsity, or with reckless disregard as to the truth or falsity.  Plaintiff is further informed and believes, and upon that basis, asserts that such False Statements were specifically directed and communicated to individuals considering Plaintiff's services, as well as Plaintiff's colleagues, associates, team members, neighbors, friends and family, for the purpose of damaging Plaintiff's reputation and business.

163.    Upon information and belief, the False Statements were read by visitors of the Internet, throughout the State of Pennsylvania and throughout the Greater Pittsburgh area, including but not limited to Plaintiff's current, past, and prospective business associates, neighbors, friends, and family.

164.    As a direct and proximate result of the False Statements, Plaintiff has suffered significant reputational harm and sustained actual damages including, but not limited to, loss of capital and revenue, lost productivity, expenses incurred, and loss of intangible assets in an amount exceeding the jurisdictional minimum of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

165.    Plaintiff requests a permanent injunction halting the continued dissemination of the False Statements described herein, and further ordering Defendant Azeff to remove the False Statements from the Internet, and requests Google, Bing, Yahoo!, and other search engine providers to remove the Publications, and the URLs containing those statements, from their respective search results. Plaintiff further requests that Facebook and Twitter, and any other social networking providers, remove the statements and any URLs directing people to the statements. Plaintiff further requests that Issuu, DocDroid, SlideShare, and any other file hosting provider,

remove any files containing the Defamatory Statements from their servers.   Plaintiff further requests that Defendant Azeff is enjoined from further activity that would defame and otherwise continue to inflict harm to Plaintiff.   Without a permanent injunction judgment of this Court, Defendant Azeff's False Statements will continue to cause great and irreparable injury to Plaintiff and Defendant Azeff will be able to continue her tortious campaign against Plaintiff.

### Count V: Invasion of Privacy – False Light

166.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-165 as though set forth fully herein.

167.    Through the False Statements, Defendant Azeff has given publicity (i.e. widespread dissemination on the Internet) to matters concerning Plaintiff that unreasonably place Plaintiff in a false light before the public as the publications create the false impression, among other things, that Plaintiff engages in a wide variety of illegal, violent, criminal, fraudulent, unsavory, threatening, discriminatory, abusive, unethical, and immoral behaviors.

168.    The False Statements contain such major misrepresentations and create such a false impression of Plaintiff's character, history, activities, and beliefs that serious offense may reasonably be expected to be taken by a reasonable person in his position.

169.    The false light in which Plaintiff has been placed would be highly offensive to a reasonable person.

170.    Defendant Azeff's actions constitute actual malice as they had knowledge of or acted in reckless disregard as to the falsity of the publicized matters and the false light in which Plaintiff would be placed.

171.    The false light in which Plaintiff has been placed has caused and would cause mental suffering, shame, and humiliation to a person of ordinary sensibilities.

172. As a result of the false light in which he has been placed, Plaintiff has suffered harm to his interest in privacy, mental distress, and special damages, in an amount exceeding the jurisdictional minimum of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

### Count VI: Intentional Infliction of Emotional Distress

173. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-172 as though set forth fully herein.

174. Defendant Azeff maliciously propagated the False Statements for the purpose of destroying Plaintiff's reputation and standing in the community.

175. Defendant Azeff maliciously collaborated with the Activist, a defendant in highly contentious litigation who had a history of engaging in cyberstalking conduct targeting Plaintiff, for the purpose of causing severe emotional distress to Plaintiff.

176. Defendant Azeff maliciously targeted and timed her False Statements to exert the maximum possible emotional distress to Plaintiff.

177. Defendant Azeff's actions were undertaken with the intent to cause, or in disregard of a substantial probability of causing severe emotional distress to Plaintiff.

178. It is highly foreseeable that a causal connection would exist between the deliberate and malicious targeted harassment that Defendant Azeff directed toward Plaintiff and the resulting injury to Plaintiff of severe emotional distress.

179. As a direct and proximate result of Defendant Azeff's intentional infliction of emotional distress, Plaintiff has suffered physical and mental harm and other damages in an amount exceeding the jurisdictional minimum of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

**Count VII: Publicity Given to Private Life**

180.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-179 as though set forth fully herein.

181.     While the vast majority of the statements promulgated by Defendant Azeff were false, misleading, and defamatory, there were several true highly personal and private facts contained within the Defamatory Statement and Defamatory Manifesto which had no business being made public.

182.     Out of the extensive array of False Statements, the sparse number of facts contained within the Defamatory Statement and the Defamatory Manifesto included that Plaintiff and his partner experienced a miscarriage, along with the public dissemination of Plaintiff's residential address. Further, Defendant Azeff publicly published a private medical record regarding Plaintiff, detailing that he experienced ear infections as a young child. These personal facts were cast in a false light and used to add further credence to the False Statements.

183.     The disclosure of Plaintiff's private childhood medical record and the fact that Plaintiff and his partner experienced a miscarriage, have no legitimate public interest and was propagated by Defendant for the sole reason of causing damages and distress to Plaintiff.

184.     The disclosure of Plaintiff's childhood medical record and miscarriage would be highly offensive to a reasonable person.

185.     The disclosure of Plaintiff's childhood medical record and miscarriage have no legitimate public interest and was propagated by Defendant Azeff for the sole purpose of causing Plaintiff damages and distress.

186.     As a direct and proximate result of Defendant Azeff's intentional disclosure of private details concerning Plaintiff's life, Plaintiff has suffered damages in an amount exceeding

the jurisdictional minimum of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

## Count VIII: Intrusion Upon Seclusion / Intrusion into Private Affairs

187.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-186 as though set forth fully herein.

188.    Defendant Azeff intentionally invaded Plaintiff's privacy by repeatedly publishing the False Statements regarding Plaintiff which contained private details about Plaintiff's life and to which the public has no interest in knowing.

189.    Defendant Azeff intentionally invaded Plaintiff's privacy by repeatedly reaching out to Plaintiff's contacts to relay false and defamatory information concerning him.

190.    Defendant intentionally and maliciously included Plaintiff's private residential address alongside her False Statements, both in her Defamatory Statement and Defamatory Manifesto.

191.    Defendant intentionally and maliciously provided Plaintiff's private residential address to the Activist, a criminally convicted stalker who was engaged in obsessive and inappropriate conduct targeting Plaintiff.

192.    By publishing Plaintiff's private residential address alongside highly inflammatory False Statements that could inspire violence, along with falsely claiming that an "arsenal" of five to six firearms was present at Plaintiff's residential address, Defendant Azeff put Plaintiff at risk of targeted crime.

193.    Through the publication of their False Statements, Defendant Azeff encouraged others to contact Plaintiff directly and indirectly.

194.    Communication from Defendant Azeff and others acting on Defendant Azeff's publications was and is unwanted and offensive.

195.    The False Statements made and published by Defendant Azeff, and Defendant Azeff's intentional intrusion upon Plaintiff's privacy, would be highly offensive and distressing to a reasonable person, and continue to be highly offensive and distressing to Plaintiff.

196.    Defendant Azeff's False Statements unreasonably attack Plaintiff's conduct and character in a manner that exceeds the bounds of decency.

197.    Defendant Azeff has subjected Plaintiff and his personal affairs to unwanted attention and scrutiny in both Plaintiff's personal and professional life.

198.    As a direct and proximate result of Defendant Azeff's intrusion and the publication of the False Statements, Plaintiff has suffered significant reputational harm and sustained actual damages including mental anguish, loss of capital revenue, lost productivity, other expenses incurred, and loss of intangible assets in an amount exceeding the jurisdictional minimum of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

## **PRAYER**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in his favor, and against Defendant Althea Azeff, and grant relief as follows:

(a)    Issuance by this Court of an Order decreeing that the False Statements regarding Plaintiff are false and defamatory;

(b)    Permanent injunctive relief that Defendant Azeff is prohibited from republishing the False Statements about Plaintiff, his family members, employees, business partners, attorneys, agents, servants, representatives, businesses, trademarks, or services which defame, disinform, or contain libelous statements about Plaintiff;

(c)      Permanent injunctive relief that Defendant is ordered to take all actions necessary to remove all of the False Statements she has previously published;

(d)      Actual and/or compensatory damages and/or general damages, with the exact amount to be proven at trial;

(e)      Punitive or exemplary damages, with the amount to be determined at trial;

(f)      Costs of this action, reasonable attorney fees, and pre- and post-litigation interest at the maximum rate provided by law;

(g)      For any and all other relief to which the Court determines Plaintiff is entitled.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims

Respectfully submitted,


/s/ Andrew C. Stebbins_____
Andrew C. Stebbins (0086387)
Admitted Pro Hac Vice
**Minc Law LLC**
200 Park Avenue, Suite 200
Orange Village, OH 44122
Telephone: (216) 373-7706
astebbins@minclaw.com

*Attorney for Plaintiff*